910 F.2d 695
 Jim L. CONSIDINE, Plaintiff-Appellee,
v.
The BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF ADAMS,
STATE OF COLORADO; Steve Cramer; Ron Younger; Ron Nichol,
individually and as present or former members of the Board
of County Commissioners of the County of Adams; and Robert
Clifton, individually and as the former County Administrator
of the County of Adams, Defendants-Appellants.
 Nos. 89-1016, 89-1017.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 3, 1990.
 
 Sandra Spencer Coleman (Michael W. Anderson and William F. Campbell, with her on the brief), of White and Steele, P.C., Denver, Colo., for plaintiff-appellee.
 Patrick B. Mooney of Semple & Jackson, P.C., Denver, Colo. (Martin Semple of Semple & Jackson, P.C., Denver, Colo., and Ronald K. Olson, Acting County Atty., County of Adams, Brighton, Colo., with him on the briefs) for defendants-appellants.
 Before TACHA, and BRORBY, Circuit Judges, and VAN BEBBER,* District Judge.
 BRORBY, Circuit Judge.
 
 
 1
 Defendants-appellants bring this interlocutory appeal from the order of the United States District Court for the District of Colorado denying appellants' motions for summary judgment and summary judgment based on qualified immunity as to plaintiff-appellee's First Amendment claim.
 
 
 2
 * Plaintiff-appellee Considine is a former employee of Adams County, Colorado ("the county"). In 1988, he filed suit in the district court against the county and defendants Steve Cramer, Leo Younger and Robert Clifton, in their capacities as county officials and as individuals, alleging that his employment was terminated in 1985 in violation of his First and Fourteenth Amendments rights. (Defendants-appellants Cramer and Younger are former county commissioners. Defendant-appellant Clifton is a former county administrator.) Considine also raised pendent state claims for breach of contract, defamation, interference with contractual relations, conspiracy, promissory estoppel, and exemplary damages.
 
 
 3
 From November 1977 until June 1985, Considine served as director of the county's division of community and recreational resources. In that capacity, Considine had authority over the county's waste management, building inspections, planning department, golf course, regional park, extension service office and economic development. His position required a close working relationship with the board of county commissioners ("the board" or "the commissioners").
 
 
 4
 The planning department had authority over gravel mining operations within the county. Accordingly, the department received and processed applications for gravel operations, made recommendations thereon to the planning commission and to the board, maintained official county records and monitored the progress of gravel mining operations. Considine was notified of any problems with gravel mining operations and occasionally would personally perform on-site inspections of gravel pit operations to assess whether they were in compliance with county regulations. Consistent with his job responsibilities, Considine would determine whether any given problem should be brought to the attention of the board. If Considine felt a problem warranted board attention, he would usually bring the matter before the board himself.
 
 
 5
 While serving as division director, Considine was twice appointed by the board as project director to oversee two applications (filed in 1982 and 1983) for the operation of a hazardous waste site within the county ("the Highway 36 project"). As project director, Considine was responsible for coordinating the efforts of county staff and consultants; assimilating data and input from the applicant, opponents and the public concerning the application; and formulating a recommendation to the board through the planning commission whether the application should be approved or denied. Considine stated that it was "specifically my job to evaluate and analyze the proposals for the Highway 36 project."
 
 
 6
 Considine also had ultimate responsibility for county golf course operations. In 1984 and continuing into 1985, the commissioners undertook the construction of a new golf course. In connection with the construction of the golf course, it was determined that the Brantner ditch, which ran adjacent to the old golf course, should be relocated. The commissioners assigned this problem to Considine. Part of his responsibility was to report the problems and progress of the Brantner ditch operation to the commissioners.
 
 
 7
 As formulated in the complaint, Considine's First Amendment claim alleges that he was terminated as "a direct result of statements made and positions taken by him in regards to matters of public health, safety and welfare in connection with administrative handlings of certain gravel pit operations, ditch company contracts [the Brantner Ditch] and hazardous waste disposal sites [the Highway 36 project]."
 
 
 8
 A. STATEMENTS CONCERNING THE GRAVEL PIT OPERATIONS
 
 
 9
 In his answers to defendants' interrogatories, Considine identifies five gravel pits in Adams County concerning which he made statements or took positions that he contends were protected by the First Amendment. Considine claims that statements were made to the commissioners, the county administrator and other county officials and that the position taken by him concerning each pit "was one of public health, safety, and welfare." Considine identifies approximately fifty dates when he discussed the gravel pits with the commissioners and states that there were other, unspecified dates on which he made statements. In addition, Considine testified that he was terminated for discussing the gravel pits with various named members of the media.
 
 
 10
 Considine's statements addressed the adequacy of fencing at four of the gravel pits, the propriety of the underwater slope of two gravel pits, the pit operator's failure to adhere to pit reclamation plans at two pits, improper mining operations at two pits, failure to maintain a berm at one pit, improper riverbed mining at one pit, the creation of an "attractive nuisance" at one pit, and endangerment to bridge abutments at one pit.
 
 
 11
 In his deposition, Considine testified that the commissioners seemed irritated with him for bringing to them problems concerning the Adams County gravel pit. He believed the commissioners felt he was not being cooperative with them in dealing with the Mann Lake gravel pit. He felt the commissioners became irritated with his efforts and those of his staff to negotiate a resolution to problems at the Seigrist Lake gravel pit. Concerning the Zigan gravel pit, Considine recommended that the commissioners hold a show cause hearing. The commissioners held the hearing, but Considine felt they were unhappy at having to do so.
 
 
 12
 B. STATEMENTS CONCERNING THE HIGHWAY 36 PROJECT
 
 
 13
 Considine contends that his statements concerning the Highway 36 project were made to the commissioners, the county administrator, the county planning department staff, the county public works division staff, the Concerned Citizens of Eastern Colorado and its members, Joe French, Esq., various named members of the press, and various named representatives of the Environmental Protection Agency ("EPA"). Considine also identifies a number of dates when his positions were discussed and states that he made "numerous" additional statements on unspecified dates.
 
 
 14
 As director in charge of processing hazardous waste site applications, Considine contends he took the position that the Highway 36 project posed a threat to the public safety in areas of police response, fire protection, and emergency preparedness and response; that the applicant did not have the financial ability to operate the site; that the applicant had not documented its reliability, competence and expertise; and that the site did not conform to various county land use plans, policies, and regulations.
 
 C. STATEMENTS CONCERNING THE BRANTNER DITCH
 
 15
 Considine identifies the commissioners, the county administrator, various named county officials and employees, members of the Brantner Ditch Board of Directors and representatives of the City of Northglenn, Colorado, as recipients of his statements concerning the Brantner ditch. He states that his position on the Brantner ditch was discussed at commissioner study sessions on four specific dates and that there were "many other meetings" at which such discussions occurred, "the specific dates of which are impossible to ascertain."
 
 
 16
 Considine contends he took the position that to divert water from the old ditch to the new ditch was illegal, that the diversion of water was in violation of an agreement between the ditch company and the county and that the new ditch may not have been properly designed. In his deposition, Considine testified that these concerns were expressed at a meeting he attended with the county attorney and county administrator Clifton. At this meeting, Clifton expressed concerns that the ditch be filled as soon as possible. Considine expressed concerns about the physical integrity of the new ditch and the county attorney (not Considine) expressed concerns about the legality of diverting water into the new ditch.
 
 
 17
 After discovery, defendants moved for summary judgment on all claims. Defendants argued, inter alia, that the speech relied upon by plaintiff is not protected by the First Amendment and that defendants are entitled to qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The district court entered judgment for all defendants on plaintiff's Fourteenth Amendment and pendent state claims,[1] but preserved plaintiff's First Amendment and exemplary damages claims[2] and held that the individual defendants were not entitled to qualified immunity from suit as to plaintiff's First Amendment claim.
 
 
 18
 On appeal, defendants challenge the district court's denial of summary judgment on two grounds: (1) the speech underlying plaintiff's claim is not protected by the First Amendment; and (2) plaintiff's First Amendment rights were not clearly established at the time he was terminated.
 
 II
 
 19
 "[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); Wulf v. City of Wichita, 883 F.2d 842, 856 (10th Cir.1989). The threshold inquiry in determining whether a governmental employer's employment decision violates the First Amendment rights of an adversely affected employee is whether the speech at issue "may be 'fairly characterized as constituting speech on a matter of public concern.' " Rankin, 483 U.S. at 384, 107 S.Ct. at 2897 (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983).
 
 
 20
 If the threshold is passed, a court must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968); Rankin, 483 U.S. at 384, 107 S.Ct. at 2896-97; Connick, 461 U.S. at 140, 103 S.Ct. at 1686.[3]
 
 
 21
 The district court, without extensive discussion of the public concern issue, determined that plaintiff's speech was protected by the First Amendment after applying the Pickering balancing test. Additionally, the district court found that the allegations in plaintiff's affidavit and testimony "are sufficient to raise a genuine issue of material fact as to whether plaintiff was terminated because of his exercise of his right of free speech."[4] The district court concluded "given the facts as testified to by plaintiff, summary judgment on the First Amendment claim would be inappropriate."
 
 
 22
 In order to determine whether particular "speech" is protected, this court must perform a de novo review of the whole record. Wulf, 883 F.2d at 856; Rankin, 483 U.S. at 386 n. 9, 107 S.Ct. at 2897 n. 9. In reviewing the summary judgment determination of the district court, this court applies the same standard employed by the trial court under Fed.R.Civ.P. 56(c).[5] Osgood v. State Farm Mutual Auto. Ins. Co., 848 F.2d 141, 143 (10th Cir.1988).
 
 A. PUBLIC CONCERN
 
 23
 Speech on a matter of public concern is generally defined as speech "fairly considered as relating to any matter of political, social, or other concern to the community," Connick, 461 U.S. at 146, 103 S.Ct. at 1690, in contrast to speech "as an employee upon matters only of personal interest," id. at 147, 103 S.Ct. at 1690. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48, 103 S.Ct. at 1690. Based on these standards, we hold that plaintiff's statements constitute speech on matters of public concern.
 
 
 24
 Included within the Connick inquiry is a focus on "the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties." Koch v. City of Hutchinson, 847 F.2d 1436, 1445 (10th Cir.) (citing Cox v. Dardanelle Pub. School Dist., 790 F.2d 668, 672 (8th Cir.1986) ("The focus is on the role the employee has in advancing the particular expressions: that of a concerned public citizen, informing the public that the state institution is not properly discharging its duties ...; or merely as an employee, concerned only with internal policies or practices which are of relevance only to the employees of that institution.")); cert. denied, 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988); see also, Wulf, 883 F.2d at 857; Conaway v. Smith, 853 F.2d 789, 796-97 (10th Cir.1988).
 
 
 25
 Considine's statements alleged that numerous statutory and regulatory public health and safety violations were occurring on projects that were sponsored by the county and under the direction of the county's elected officials and administrative staff. Although Considine's statements did not directly assign culpability to the board or other particular individuals, their content naturally suggests that, if true, the county institution was not "properly discharging its duties." His statements cannot be fairly characterized as concerning only internal policies and practices of relevance only to county employees.[6]
 
 
 26
 Moreover, Considine's statements were delivered directly to members of the media, representatives of the EPA, and members of the Concerned Citizens of Eastern Colorado. Thus, Considine communicated his concerns directly to persons and organizations outside the normal chain of command of his workplace capable of bringing public and regulatory pressure to bear on the county. It is true that some of plaintiff's statements were made during the course and as a part of his official duties--a factor that weighs against a finding that speech involves matters of public concern. Koch, 847 F.2d at 1447. However, there is no indication in the record that Considine's job responsibilities included alerting the media, regulatory agencies and citizen groups to the possible statutory and regulatory violations and other alleged irregularities occurring on Adams County projects. Accordingly, we can only conclude that his statements were "calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties." Id. at 1445.
 
 
 27
 In terms of content and context, Considine's statements are extremely similar to the types of speech held to touch on matters of public concern by this court on other occasions. For example in Wulf, a lieutenant in the defendant city's police force was fired by the defendant chief of police after the lieutenant prepared and sent a letter to the Kansas attorney general requesting an investigation of certain activities and incidents within the police department. 883 F.2d at 852-53. In Conaway, an electrical inspector for the City of Kansas City, Kansas, was terminated after submitting a report to top-level administrators that criticized the actions of his immediate supervisor for approving a facility as operational despite certain electrical violations. 853 F.2d at 791. Finally, in Schalk v. Gallemore, 906 F.2d 491 (10th Cir.1990), a hospital patient accounts clerk was fired by defendant, the hospital's chief administrator, after writing a letter to and speaking with hospital board of trustees members about what she perceived as "waste," "inefficiency" and "favoritism" at the hospital. Id. at 492-93. The letter in Wulf, the report in Conaway and the communications in Schalk were all held to touch on matters of public concern. See Wulf, 883 F.2d at 857-59; Conaway, 853 F.2d at 796-97; Schalk, 906 F.2d at 495-96.
 
 
 28
 Based on our review of the record and the content, form and context of plaintiff's statements, we conclude that plaintiff has met his burden of establishing that his speech touches on a matter of public concern. Accordingly, defendants are not entitled as a matter of law to summary judgment on this issue.
 
 B. PICKERING BALANCING
 
 29
 We must next consider, based on the record before us, whether Considine's interest in making his statements is outweighed by the interest of defendants in "promoting the efficiency of the public services it performs through its employees." Rankin, 483 U.S. at 384, 388, 107 S.Ct. at 2896-97, 2898 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1735). In this regard, the "State bears a burden of justifying the discharge on legitimate grounds." Rankin, 483 U.S. at 388, 107 S.Ct. at 2898 (citing Connick, 461 U.S. at 150, 103 S.Ct. at 1691-92).
 
 
 30
 Balancing the competing interests of the employee and the government requires the consideration of the time, place and manner of the employee's expression. Connick, 461 U.S. at 152-53, 103 S.Ct. at 1692-93. Specific considerations relative to the defendants' interest include " 'whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' " Wulf, 883 F.2d at 861 (quoting Rankin, 483 U.S. at 388, 107 S.Ct. at 2899); see also Pickering, 391 U.S. at 570-73, 88 S.Ct. at 1735-37.
 
 
 31
 Even more specifically, the Supreme Court has recognized that "[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." Rankin, 483 U.S. at 390, 107 S.Ct. at 2900. That burden is greater when the employee serves in a "confidential, policymaking, or public contact role." Id. at 390-91, 107 S.Ct. at 2900. Finally, where appropriate, a court must consider whether the employee's speech calls into question the employee's general ability and competence to perform his/her job. Koch, 847 F.2d at 1450 (citing Pickering, 391 U.S. at 573 n. 5, 88 S.Ct. at 1737 n. 5).
 
 
 32
 Here, defendants have not presented evidence sufficient to permit a balancing of their interest in the effective functioning of county government against Considine's interest in free speech. As we noted earlier, it is the governmental defendant's burden in these cases to justify the challenged discharge on legitimate grounds. Once an employee's speech is determined to touch on a matter of public concern, the discharge can be legitimate only if the government's interest outweighs that of the speaker. Necessarily, defendants must provide specific evidence sufficient to assess the character and weight of its interest.
 
 
 33
 Based on the present record, we can state with authority only that Considine held a relatively high-ranking position within the county, that some of his statements were made during the course of his official duties and that some of these statements "irritated" some of his superiors. While these vague conclusions are indeed relevant to our analysis of defendants' interest, we cannot say, without a more specific factual basis, that they are sufficient to tip the Pickering scales in defendants' favor.
 
 
 34
 As we have discussed, in assessing the weight of the government's interest in any particular case under Pickering, this court must consider a variety of factors as revealed by specific facts. However, the record here does not specifically reveal "the extent of authority and public accountability [Considine's] role entails," Rankin, 483 U.S. at 390, 107 S.Ct. at 2900, or the extent to which Considine's position can be classified as a "confidential, policymaking, or public contact role," id. at 390-91, 107 S.Ct. at 2900. Thus, we are not equipped to say just what "burden of caution," id. at 390, 107 S.Ct. at 2899-2900, Considine bore with respect to the words he spoke or to the contexts in which he chose to speak. Moreover, there is no evidence indicating that his statements reflected negatively on his abilities to perform his job, that they "impair[ed] discipline by superiors or harmony among coworkers," or that they "impede[d] the performances of the speaker's [Considine's] duties or interfere[d] with the regular operation of the enterprise [the county government]." Rankin, 483 U.S. at 388, 107 S.Ct. at 2899.
 
 
 35
 Accordingly, we agree with the district court in concluding that defendants are not entitled to summary judgment as a matter of law under Pickering at this stage of the proceedings.
 
 III
 
 36
 Appellants also challenge the district court's denial of their motion for summary judgment based on qualified immunity. The denial of a qualified immunity claim is reviewable de novo as a final decision under 28 U.S.C. Sec. 1291. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985). Government officials performing discretionary functions are entitled to qualified immunity from suit insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The key to the inquiry is the 'objective reasonableness' of the official's conduct in light of the legal rules that were 'clearly established' at the time the action was taken." Melton v. City of Oklahoma City, 879 F.2d 706, 727 (10th Cir.1989) (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738), reh'g granted in part, 888 F.2d 724 (10th Cir.1989).
 
 
 37
 It is particularly difficult in the First Amendment context to determine whether the applicable law was "clearly established" because the Connick public concern inquiry and the Pickering balancing test are to be performed in light of particularized facts on a case-by-case basis. Melton, 879 F.2d at 727. In the First Amendment context, the Harlow inquiry must focus on whether, at the time the actions adverse to the employee-speaker were taken, the defendants would have been reasonably on notice that the speech at issue addressed a matter of public concern and that their interest in the effective functioning of their governmental enterprise would be insufficient for purposes of Pickering balancing to outweigh the employee's free speech interest. See Melton, 879 F.2d at 729.[7]
 
 
 38
 Here, we have already concluded that the record is insufficiently developed to enable a proper Pickering balancing inquiry and thus to determine whether defendants' actions violate the First Amendment. Without specific facts relative to the defendants' interest, it is also impossible to render a conclusion in favor of defendants under Harlow.
 
 
 39
 To afford qualified immunity protection to defendants, we would have to determine that it was not clearly established in 1985 both that: (1) Considine's statements constituted speech on matters of public concern; and (2) Considine's interest in making those statements would outweigh, for purposes of the Pickering test, defendants' interest in the effective functioning of the county government.
 
 
 40
 Since Connick was published in 1983, the structure of the public concern inquiry was "clearly established" in mid-1985. Additionally, on the basis of the facts of Pickering itself, where a teacher's letter to a local newspaper criticizing the school board's allocation of funds and other activities was considered a matter of public concern, 391 U.S. at 564, 568, 88 S.Ct. at 1734-35, we conclude it was also "clearly established" in 1985 that statements of the type made by plaintiff here would constitute speech on a matter of public concern.
 
 
 41
 However, without particularized facts in the record defining the contours of defendants' interest in this case, we simply are unable to reach a conclusion as to the Pickering portion of the above equation. Accordingly, we conclude defendants are not entitled to summary judgment based on qualified immunity at this stage of the proceedings.
 
 
 42
 The order of the district court denying appellants' motion for summary judgment on plaintiff's First Amendment claim is AFFIRMED.
 
 
 
 *
 The Honorable G. Thomas Van Bebber, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Plaintiff-appellee's challenges to the district court's resolution of these claims were considered separately on appeal. We affirmed the district court's determinations thereon in an unpublished order and judgment in Nos. 89-1071, 89-1118 and 89-1119, filed August 3, 1990
 
 
 [2]
 The parties are agreed that there is no independent claim for exemplary damages and that such damages may only be awarded in the event actual damages are awarded on one of plaintiff's seven independent claims for relief
 
 
 [3]
 "Upon a finding that the speech in question is constitutionally protected, the plaintiff must prove that the speech was a substantial or motivating factor in the challenged employment decision." Wulf, 883 F.2d at 856-57 (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). The burden then shifts to the defendant to show by a preponderance of the evidence that it would have reached the same decision absent the protected activity. Wulf, 883 F.2d at 857
 
 
 [4]
 Defendants have not challenged this determination on appeal
 
 
 [5]
 Fed.R.Civ.P. 56(c) reads:
 (c) Motion and Proceedings Thereon.... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....
 
 
 [6]
 We find Considine's statements distinguishable from the speech at issue in Koch in this regard. The record in Koch did not support a conclusion that the speech at issue therein, a written report stating the plaintiff fire marshal's opinions as to the cause of a fire, alleged improprieties that could be attributed to the defendant city. See 847 F.2d at 1447
 
 
 [7]
 The formulation of the Harlow test used here by the district court was too generally stated. The district court found "that the right of public employees not to be terminated because of their exercise of the right to free speech was clearly established throughout the relevant time period." However, the Supreme Court has made clear that to withhold qualified immunity, the unlawfulness of the "very action in question" must be apparent. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)
 In Creighton, the Court of Appeals for the Eighth Circuit held that the defendant was not entitled to summary judgment on qualified immunity grounds because the right the defendant was alleged to have violated--the right of a person to be protected from warrantless searches of one's home unless searching officers have probable cause and there are exigent circumstances--was clearly established. Creighton v. St. Paul, 766 F.2d 1269, 1277 (8th Cir.1985). The Supreme Court concluded that the Court of Appeals erred by not considering whether "it was not clearly established that the circumstances with which [the defendant] was confronted did not constitute probable cause and exigent circumstances." 483 U.S. at 640-41, 107 S.Ct. at 3039 (emphasis in original). The contours of the right allegedly violated must be "clearly established" in a more particularized and relevant sense. Id. at 640, 107 S.Ct. at 3039.